**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Criminal Case No. 21-cr-00332-RMR

UNITED STATES OF AMERICA,

    Plaintiff,

v.

LYNDELL DANIELS,

    Defendant.

---

**ORDER**

---

This matter is before the Court on the Defendant's Motion to Suppress, filed at ECF 37. The Defendant asks the Court to suppress all evidence obtained as a result of his seizure on February 7, 2021. The Defendant argues that the Officer who detained him, Officer Idler, lacked a reasonable suspicion to do so. As a result of this unlawful detention, the Defendant argues, the officer obtained statements that were later used to obtain a warrant for Mr. Daniels's DNA. The Defendant asks the court to suppress both the statements obtained and the later DNA collection. The Court held an evidentiary hearing on ECF 37 on September 12, 2022.[1] The Court also ordered the parties to submit

---

[1] The Defendant has also filed a Motion to Suppress Fruits of Unlawful Warrant, ECF 38, and a motion for *Franks* hearing, ECF 57. Those motions were not addressed during the September 12, 2022 hearing, and they will not be addressed in this Order.

additional documentation setting forth the specific facts known to Officer Idler at the moment he detained the Defendant. These documents were filed at ECF Nos. 59 and 60. For the reasons that follow, the Defendant's motion is **GRANTED**.

## I.     Background

On the evening of February 7, 2021, at approximately 11:35 pm, the Aurora Police Department received a 911 call. The caller stated that there were three black males in the parking lot of the apartment complex at 15501 E. Alameda Pky. in Aurora, Colorado. The caller stated that the men were "intermittently taking out guns and then putting them back in pockets." ECF 41-1. The caller described the situation as "not an emergency." The 911 caller described the clothing of each of the individuals that she purportedly saw: She stated that the first individual was wearing a black hoodie and black jeans. She stated that the second individual was wearing a black hoodie and jeans. She stated that the third individual was wearing a gray hoodie and blue jeans. The caller also described a "dark color SUV" and stated that the individuals were getting in and out of the vehicle.

Police were dispatched to the area for an "area watch" request. Two officers, Officer Idler and Officer Snow, arrived at the scene. The parking lot was well-lit, and the apartment complex was densely-populated. Officer Idler testified that, on arrival, he observed a black SUV in the parking lot. Body camera evidence also shows a dark red SUV in the parking lot. The Defendant was standing approximately five to ten feet away from the black SUV. The Defendant was wearing a bright orange jumpsuit, with an orange hood. Officer Idler testified that he heard the Defendant say something, but he does not

know what the Defendant said. He testified, however, that the Defendant was not yelling. Officer Idler identified himself, raised his weapon, and approached the Defendant. He told the Defendant to put his hands up. The Defendant complied immediately and stated, "Don't shoot." Officer Idler testified that the Defendant was detained at 23:39:37 or 23:39:38. Hearing Tr. 46:10-16. The black SUV exited the parking lot between 23:39:30 and 23:39:40.

During the course of the Defendant's detention, Officer Idler obtained the Defendant's name. After running a criminal history check on the Defendant, Officers learned that the Defendant was a previously convicted felon. Using this information, the Officers obtained a warrant for Mr. Daniels' DNA.

## II. Applicable Law

The Fourth Amendment protects individuals from "unreasonable searches and seizures," U.S. Const. amend. IV, including unreasonable "investigatory stop[s]" or detentions. *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir.2010). In *Terry v. Ohio*, the Supreme Court established that a law enforcement officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest." *United States v. Treto–Haro*, 287 F.3d 1000, 1004 (10th Cir.2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotation marks omitted). An investigatory detention "is justified at its inception if 'the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a

person has or is committing a crime.'" *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir.); *see also United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion ... that criminal activity 'may be afoot,' even if the officer lacks probable cause." (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. 1868)). "Reasonable suspicion requires the officer to act on 'something more than an inchoate and unparticularized suspicion or hunch," but "the level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause." *United States v. McHugh*, 639 F.3d 1250, 1255–56 (10th Cir. 2011). When considering whether an officer has a reasonable suspicion of criminal activity, the court "judge[s] the officer's conduct in light of common sense and ordinary human experience," the Court "consider[s] the reasonableness of an officer's actions using an objective standard." *Id.* Under this objective standard, we ask "whether 'the facts available' to the detaining officer, at the time, warranted an officer of 'reasonable caution' in believing 'the action taken was appropriate.'" *Id.* (quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868).

"When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991). In this case, there is no dispute that the Defendant was "seized" for Fourth

Amendment purposes. The Court need therefore only determine whether the seizure of Mr. Daniels was justified.

Under the Fourth Amendment, an investigative detention such as the one that occurred here is reasonable if it is (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009). When making this determination, the credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court. *Id.*

### III.    Analysis

The question Defendant presents is whether, at the time of the detention, Officer Idler had reasonable suspicion sufficient to detain him. The Defendant argues that the 911 call did not provide reasonable suspicion, and, at the time that Officer Idler detained Mr. Daniels, there was no other information that would have added to a reasonable suspicion calculus. The Government argues that the totality of the circumstances suggests that the officers had a reasonable suspicion sufficient to detain the Defendant. On review of the evidence, the Court agrees with the Defendant, and finds that Officer Idler lacked a reasonable suspicion sufficient to detain the Defendant.

On September 12, 2022, the Court held an evidentiary hearing. The parties addressed the specific sequence of events leading up to the detention. Because the parties agree that the detention of an individual must be justified at its inception, they also

appear to agree that the relevant evidence is that which was known to Officer Idler before he detained the Defendant.

During his testimony, Officer Idler acknowledged that the Defendant was detained as of 23:39:37. The Court must therefore determine what information Officer Idler had available to him at that time and whether it is objectively sufficient to establish a reasonable suspicion that criminal activity was afoot as of that moment. A review of the evidence reflects the following facts and circumstances known to Officer Idler at the moment he detained the Defendant:

1. The 911 call and CAD notes, which described the subjects and vehicles;
2. The presence of the black SUV and the fact that it drove away;
3. The area in which the detention happened;
4. The time of day of the detention.

The Court must determine whether, based on these facts, the detention was justified. The Court will analyze each fact, and it will then consider all of the facts together to determine whether the totality of the circumstances supports a finding of reasonable suspicion sufficient to support the Defendant's detention.

### A.   911 Call and CAD Notes

The parties dispute whether the 911 call provides support for a finding of reasonable suspicion. As a threshold issue, the Court notes that Officer Idler testified that he had not actually listened to the 911 call when he responded to the scene. Hearing tr., 19:19-20:8. Instead, the Officer testified that he relied solely on the Computer Aided Dispatch ("CAD") notes, attached to the Government's response at

ECF 41-1. The CAD notes reflect that the "call type" was initially listed as an "Area Watch." The initial remarks state:

> RP REPORTING 3 PTYS OUTSIDE OF BLDG RP SAYS PTYS HAVE GUNS IN THEIR HANDS AND POCKETS RP BELIEVES PTYS LOOK LIKE THEY ARE GETTING READY TO DO SOMETHING PR ADV CURRENTLY NOT AN EMERG…

ECF 41-1, 3.

The CAD notes specify that the caller identified three men. A black male wearing a black hoodie and black jeans, a black male wearing a black hoodie and jeans, and a black male wearing a gray hoodie and blue jeans. *Id.* at 6. The CAD identified a dark color SUV and a silver or white sedan and included "RP ADV PTYS GETTING IN AND OUT OF VEHS DESCRIBED" and "PTYS DIRECTLY IN FRONT OF DOOR."

The Government argues that "Officers Idler and Snow had reasonable suspicion to detain the defendant based on the information they received from dispatch regarding men possessing weapons that they were placing in and out of their pockets outside of vehicles in front of the caller's apartment building." ECF 41, p. 9.

The Defendant directs the Court to *Fla. v. J.L.*, 529 U.S. 266 (2000), which he contends supports a finding that the officers here lacked a reasonable suspicion. In *J.L.*, the Supreme Court considered an anonymous phone call from an individual who stated that a young black male standing at a particular bus stop and wearing a plaid shirt had a gun. Officers arrived at the bus stop six minutes later and saw three black males, one of whom, J.L., was wearing a plaid shirt. The officers detained J.L., frisked him, and seized a gun from his pocket. The Supreme Court found that the call did not provide the officers

with a reasonable suspicion to detain J.L. The prosecutor in that case argued that the tip was reliable because "its description of the suspect's visible attributes proved accurate." The Supreme Court explained, however, that "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272.

The Court in *J.L.* also considered its earlier decision in *Alabama v. White*, 496 U.S. 325 (1990). In *White*, Officers received "an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel." The Court specifically found that, "[s]tanding alone, the tip would not have justified a *Terry* stop." "Only after police observation showed that the informant had accurately predicted the woman's movements," the Court explained, "did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine." The Court ultimately found that officers had reasonable suspicion *after* police surveillance, but it classified *White* as a "close case," explaining "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband." *Id.*

Comparing the call that led to the detention of Daniels to the calls considered in *J.L.* and *White*, the Court simply cannot find that the call provides support for a finding of reasonable suspicion. The circumstances leading up to the detention of Daniels in this case reflect even less reliability than the circumstances in *J.L.* In *J.L.* the caller accurately stated that a young black man wearing a plaid shirt would be standing at a particular bus stop. The fact that the officers discovered a young black man wearing a plaid shirt at the bus stop, however, was not sufficient to support a reasonable suspicion to detain him. The caller in this case described three black men wearing dark hoodies and jeans, a white sedan, and a dark SUV. When officers arrived on the scene, they saw a dark SUV and a black man wearing a bright orange jumpsuit. The scene the officers encountered was not the scene described by the caller. The call was therefore not even reliable in its "tendency to identify a determinate person," and there are certainly not facts supporting a finding that the call was "reliable in its assertion of illegality."[2]

Not only does the 911 call here fail to support a finding of a reasonable suspicion supporting the detention of Daniels, it actually weighs against such a finding. The caller in this case took care to describe the men that she purportedly saw holding guns: they

---

[2] During the hearing, the parties argued the import of the fact that the 911 caller remained anonymous during the duration of the call. As stated on the record, the mere fact that the 911 caller here remained anonymous is not determinative. Instead, the Court finds that, regardless of whether the caller was anonymous, there was nothing in her report supporting a finding of reliability as to an assertion of illegality. Indeed, on its face, the call did not even report illegal activity. Nothing in this Order is intended to suggest that a 911 call is unreliable merely because it is anonymous.

were each wearing a dark sweatshirt and dark jeans. The CAD notes reflect this specification. When Officers Idler and Snow detained the Defendant, he was wearing a bright orange jumpsuit. The video evidence suggests that there may even have been a reflective strip across the front of it. It is objectively unreasonable to believe that the caller could have been describing the Defendant. The 911 call here therefore does not support a finding of reasonable suspicion supporting the detention of the Defendant. On the contrary, the fact that the Defendant so obviously did not match the description of the individuals identified by the caller weighs against a finding of reasonableness.

### B.     The SUV

During the hearing on the motion, Officer Idler explained that he contacted the Defendant "due to him being in the immediate vicinity and him having contact with the [dark SUV] before it sped off." Hearing tr., 29:14-17. The Officer also testified that he heard the Defendant "say something to the people in the SUV, and then the black SUV took off." *Id.* The Officer does not know what the Defendant said. *Id.* 27:13-19.

As a threshold, a review of the evidence, including body camera footage, shows more than one dark SUV in the parking lot of the complex when officers arrived. The footage shows a black SUV, which the officers associated with the Defendant, and a dark red SUV, which does not appear to have been followed or contacted. ECF 40. When discussing the Defendant's detention here, references to the "dark SUV" are to the black SUV, which can be seen exiting the parking lot before the red SUV.

During the hearing on the Defendant's motion, much was made of the dark SUV, and the Defendant's presence near it. The Court therefore considers the import of the vehicle. The Government argues that the officers had reasonable suspicion to stop the Defendant because he was associated with the SUV. This begs the question, however, of whether the SUV itself was reasonably suspicious. If there is not a reasonable suspicion to believe that the SUV (or those therein) had committed or were committing a crime, then surely there cannot be reasonable suspicion supporting the detaining of the Defendant merely for being near that SUV.

For the reasons already set forth above, the 911 call did not provide support for a finding of reasonable suspicion with regard to the SUV itself. At best, the caller identified that a dark SUV would be in a parking lot, and it was. This is precisely the type of information that the Supreme Court found not to be sufficient to support a finding of reasonable suspicion in *J.L.* Nor does the fact that the SUV left the parking lot necessarily support a reasonable suspicion as to the SUV itself. In *United States v. House*, 463 F. App'x 783, 788 (10th Cir. 2012), the Tenth Circuit found that officers did not have a reasonable suspicion to perform a *Terry* stop even where the defendant was found near a house with a suspected break-in, where the officer could see that the defendant was armed with a knife, and where the defendant turned and walked in the opposite direction when he saw police. The Tenth Circuit noted that the defendant in *House* did not engage in "headlong flight," but "merely turned around and walked in the opposite direction when

11

he saw police." *Id.* So, too, does it appear that the SUV here simply left the parking lot.[3] Further, there is no evidence here that the officers observed anything to suggest that the SUV or its occupants were carrying guns or otherwise engaged in illegal activity. While this Court is not necessarily tasked with determining whether a stop of the SUV would have been supported by a reasonable suspicion, the evidence suggests that it would not have been.

Indeed, the very fact that the officers *did not stop the SUV* right away further supports this finding. Officer Shawn Sullivan conducted the traffic stop of the SUV. He testified that, while he followed the SUV after it left the parking lot, he did not immediately pull over the vehicle. When questioned about the traffic stop, Officer Sullivan testified as follows:

> Q. [Defense counsel] Now, as you were responding, you were able to follow the vehicle that was reported to have just left the parking lot of the apartment complex?
>
> A. Yes.
>
> Q. You didn't immediately pull over that vehicle?

---

[3] The rate of speed with which the SUV drove away was discussed at length during the hearing. Officer Idler's testimony on this issue is not entirely consistent. On direct examination, Officer Idler testified that the car "took off at a high rate of speed." On review of the body camera footage, however, Officer Idler testified that the car appeared to be driving away at a normal rate of speed. Hearing tr., 42:24-43:1. He later testified that the car may have increased speed after leaving the apartment complex. On review of the evidence, the Court finds the officer's initial testimony that the car "took off at a high rate of speed" to be not credible. The video evidence clearly shows the vehicle driving away at a normal rate of speed. Whether the car may have sped up after leaving the complex is not at issue here, and the Court takes no position on the speed at which the car may have been moving after the Defendant was detained.

      A. That is correct.

      Q. And that's because you need reasonable suspicion to pull over the vehicle?

      A. Or probable cause, yes.

      Q. But you need a reason to pull over the vehicle?

      A. Correct.

      Q. At that moment, you did not have that?

      A. Correct.

Hearing tr., 112:9-17.

Without a reasonable suspicion justifying the detention of the SUV, the Court cannot find that a reasonable suspicion justified the detention of the Defendant merely for standing near that SUV. The Court thus finds that the Defendant's presence near the dark colored SUV does not support a finding of reasonable suspicion.

    **C.**    **Location and Time of the Detention**

The Government also argues that the fact that the stop occurred in a high crime area, and the fact that it occurred in the middle of the night supports a finding of a reasonable suspicion. The Tenth Circuit has confirmed that while "the fact that a stop occurred in a high-crime area cannot alone justify a Terry stop—that is, cannot by itself serve to establish "reasonable suspicion"—courts have repeatedly held that such a characteristic of the location of the stop is relevant to the analysis and may be taken into consideration." *United States v. McHugh*, 639 F.3d 1250, 1257 (10th Cir. 2011). The Tenth Circuit has likewise held that "the fact that an incident occurred late at night or early

in the morning is relevant to the *Terry* analysis." *Id.* These facts can therefore be considered when the Court considers the totality of the circumstances.

### D. Totality of the Circumstances

In determining whether reasonable suspicion justifies an investigative detention, the Court examines "the totality of the circumstances, asking whether the detaining officer has a particularized and objective basis for suspecting wrongdoing." *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010). The Court recognizes that when determining if a detention is supported by reasonable suspicion, Courts "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). That deference, however, is not untethered. While a detaining officer need only a "minimal level of objective justification" to support a reasonable suspicion, there must still must be *some* objective justification. Considering all of the facts and circumstances here, the Court cannot find that the detention was supported by reasonable suspicion.

The officers here responded to a non-emergency area watch request. The incident location was in a high-crime area, but the parking lot was well lit and the apartment complex was densely populated and heavily trafficked. A caller had reported that three black men in dark clothing were holding guns. She stated that they were getting in and out of a dark colored SUV. The caller did not identify the situation as an emergency, and reported only that she thought the men might be about to "do something." No illegal activity was identified by the caller.

The officers arrived on scene and did not see any of the men identified by the caller, nor did they see any guns. Instead, they saw the Defendant, a black man dressed in a bright orange jumpsuit, who was not observed to be holding a gun. Although Officer Idler was still some distance away, he testified that he heard the Defendant say something to the people in a black SUV and then the SUV drove away. Officer Idler could not hear what was said, and he testified that the Defendant spoke in a normal tone of voice. A dark red SUV was also in the parking lot at this time. Based on this information, Officer Idler drew his weapon and detained the Defendant at gunpoint.

At the time Defendant was detained, he was wearing a bright orange jumpsuit. Other than the fact that he was black, there was nothing about the Defendant to suggest that he was one of the individuals described by the 911 caller. Indeed, given his bright orange jumpsuit, it would be objectively unreasonable to believe that he was one of the individuals identified by the caller.

Officers testified that they had a reasonable suspicion to detain Mr. Daniels because he was standing near a dark SUV. The officers admit, however, that they did not have a reasonable suspicion to support a detention of that SUV when it left the parking lot. There is not an objective basis for finding that Mr. Daniels' presence *near* an SUV is suspicious when the SUV itself is admittedly not suspicious.

Nor is there anything about Mr. Daniels' behavior that would suggest to a reasonable officer that he was engaged in criminal activity. The Defendant was standing

outside his own home, talking to other people. He was not seen holding a gun. He did not attempt to run away from the officers. At the moment Officer Idler made contact with him, the Defendant raised his hands in the air and said "Don't shoot." Officer Idler's testimony regarding the neighborhood and the time of day, while relevant, does not provide the reasonable suspicion that the stop so obviously lacks. Based upon all the circumstances as described by the officers, there is not an objective basis to believe that the officers had a reasonable suspicion to detain the Defendant.

Because the Officers lacked a reasonable suspicion to detain the Defendant, the seizure was unlawful pursuant to the Fourth Amendment. The evidence obtained as a result of the unlawful detention must therefore be suppressed.

## IV.   Conclusion

For the reasons stated herein, the Defendant's Motion to Suppress, ECF 37, is **GRANTED.** The evidence obtained during the seizure of the Defendant on February 7, 2021, is **SUPPRESSED**. The DNA evidence obtained following the Defendant's seizure is also **SUPPRESSED.**

DATED:  September 29, 2022.

BY THE COURT:

_____

REGINA M. RODRIGUEZ

United States District Judge